## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

MOHAMAD BAZZY

       Plaintiff,

v.

CITY OF DEARBORN HEIGHTS,
 a Michigan Municipal Corporation,

       Defendant.

Case No.

Hon.

Jury Demanded

_____

## **COMPLAINT**

Plaintiff, Mohamad Bazzy (hereinafter "Bazzy"), by and through his counsel MAF Law alleges and complains against Defendant City of Dearborn Heights (hereinafter "CDH") as follows:

## **PARTIES**

1.     Bazzy is an individual employed by the Defendant CDH, Bazzy lives and works in Dearborn Heights, Michigan.

2.     Defendant CDH is a Michigan Municipal Corporation incorporated under the laws of Michigan, they oversee and are responsible for the Dearborn Heights Police Department (hereinafter "DHPD") where Bazzy worked.

3.     DHPD is operated by CDH which is a municipal corporation with a principal place of business located at 6045 Fenton, Dearborn, Heights, MI 48127 within the Eastern District Court of Michigan.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this civil action pursuant to 28 U.S.C. 1331 because it arises under a statute of the United States, specifically Section 1983 of the Civil Rights Act of 1866, 42 U.S.C. et seq., as amended. ("Section 1983") which forbids racial discrimination against any person in the "making, performance, modification and termination

of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

5.   Plaintiff further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. 1367(a) over any and all claims and causes of action that derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

6.   Venue is proper pursuant to 28 U.S.C. 1391(b)

7.   This court has personal jurisdiction over the Defendant in this district, in that Defendant, directly or through its agents conducts substantial business in the Eastern District of Michigan.

8.   Bazzy is an individual residing in and working in Dearborn Heights where all material allegations as contained herein occurred.

## **GENERAL ALLEGATIONS**

9.   Plaintiff is an American Muslim of Lebanese origin.

10.    Plaintiff is a well-respected member of the community both within the context of his professional career as a police officer and as an active citizen within the community.

11.    Plaintiff was employed by DHPD in or around the summer of 2014.

12.    At various times throughout his employment, Plaintiff was discriminated against on account of his race, religion and national origin by senior members of the DHPD and the upper management of Defendant CDH.

13.    At various times throughout his employment and continuing as of this filing, Plaintiff was retaliated against by senior members of the DHPD and the upper management of Defendant CDH.

14.    When he first began employment with the CDH, Plaintiff Bazzy was the only Arab American Muslim police officer.

15.    Although many incendiary comments were made by a significant number of his colleagues at the DHP, Bazzy took it upon himself to correct stereotypes and misconceptions as he was under the mistaken belief at that time that these officers were ignorant of how such commentary harmed Bazzy.

16.    Bazzy's approach to taking the high road or educating his colleagues didn't work as inappropriate comments and conduct continued.

17.    Several members of the DHPD throughout Bazzy's continuing tenure as a police officer made comments that Bazzy was 'too close' or 'too comfortable' with 'members of the community,' referring to his circle of individuals he associated with who were primarily of Arab/Muslim origin.

18.    Undeterred, Bazzy refused to not be friendly and/or professional towards these Arab and Muslim 'members of the community.'

19.    Bazzy began to notice an obvious divide and isolation from other DHPD when he refused to abandon his community, soon thereafter, this isolation turned into outright suspicion of Bazzy.

20.    Even as other Arab American Muslims began to be hired at the DHPD over a protracted period of time, a clear divide amongst the non Arab American Muslim was obvious and palpable, that is because of the tone set by the Dearborn Heights Chief of Police and because of how the DHPD and the CDH historically operated.

21.    In other municipalities/police departments nationwide whereby a rapid change in racial/ethnic composition of a community rapidly occurs, historically, tension and resentment has occurred from the

power structure in place. The CDH and DHPD is going through the resistance and reality of a racially demographic changing of the guard related to its Arab/Muslim population.

22.   As an Arab American Muslim, Bazzy was the first to be hired amongst a culture at the DHPD that was primarily made up of white men.

23.   Over time, it became obvious to Bazzy and several other DHPD members that any interaction, action or inaction Bazzy engaged in while carrying out his duties as a police officer was viewed by DHP with suspicion that he was trying to somehow help 'a member of his community.'

24.   Frivolous investigations, complaints and/or reprimands were lodged against Bazzy while in the course of ordinary tasks or routine tasks that others engaged in freely.

25.   In just one example, in August of 2018, Bazzy was written up and formally investigated for allegedly trying to 'help his friend' who was in DHPD custody after being physically struck b by members of the DHPD during a routine call to a residence.

26. The aforementioned individual who was in DHPD custody was as a result of several DHPD officers beating this Arab American Muslim resident when they responded to a domestic call when he tried to advise the officers that he would take his wife inside.

27. The aforementioned individual apparently attempted to take his wife inside when members of the DHPD began a physical confrontation with him that resulted in him being struck and arrested.

28. Plaintiff Bazzy received multiple calls from the individual's concerned wife who advised Bazzy that the man in custody was observing Ramadan and hadn't eaten since the prior day.

29. The DHPD Lieutenant on duty was notified of the calls from the distressed wife who witnessed her husband manhandled by the DHPD.

30. Thereafter, the same Lieutenant approved for Bazzy to bring the detainee food for Iftar back into the jail.

31. This approval was provided on a recorded line despite the fact that the Lieutenant later tried to distance himself from the approval because of an investigation in Bazzy.

32.     Bazzy knowing that the detainee would likely only consume Halal foods, simply secured a Gatorade and a granola bar at his expense and provided the same to aforementioned individual.

33.     Rather than be praised for his intervention, individuals from the DHP department who upon information and belief had been following Bazzy and tracking his every move (on and off of work) were looking for any reason to terminate him, they reported the same to then Chief of Police Lee Gavin.

34.     Bazzy was accused of trying to help the detained individual 'get out of jail' by helping him 'find a lawyer.' Bazzy did nothing other than give him a Lieutenant authorized Gatorade and granola bar.

35.     Rather than praise Bazzy for building community relations with its residents, the DHPD chose to formally investigate Bazzy in order to create a paper trail to tarnish Bazzy's record.

36.     In other incidents, at a SWAT training in Alpena, Michigan, members of the DHPD joked about "F-----g arab girls in the -ss,' naturally these comments made Bazzy very distressed.

37.     Other sexual innuendo's about Muslim women continued by DHPD officers, these comments were made directly to Bazzy.

38.   Many DHPD officers also joked about eating pork and how Bazzy is missing out by not drinking beer.

39.   While watching a snowfall and at the same SWAT training referenced in the prior paragraphs, one of Bazzy's fellow officers joked and laughed out loud to Bazzy as he stated to him that snow was like 'white sand'  and not 'brown sand.'

40.   The aforementioned discrimination actually *increased* when Bill Bazzi (hereinafter "Mayor") became the first Arab American Mayor in the city of Dearborn Heights.

41.   Although in his first few weeks in office, the Mayor acknowledged privately to Bazzy and others within the DHPD that the culture of the DHPD was 'very bad' and it was a culture of prejudice, the Mayor vowed that he wanted to change 'that' but reminded Bazzy and others to be patient.

42.   After several weeks in office, it didn't appear to Bazzy that anything was being done by the Mayor or anyone else about the work environment at the DHPD that to that point had been hostile and untenable.

43.    When Bazzy went to the Mayor again as a follow up, the Mayor and his wife Nadia Bazzi, asked Plaintiff Bazzy to file a complaint with the Michigan Department of Civil Rights (MDCR)  in order to help 'get rid of' then Chief of Police Meyers.

44.    The Mayor and his wife Nadia led Bazzy to believe that getting rid of Chief Meyer would help send a message to DHPD management and rid the DHPD of a hostile work environment.

45.    The MDCR complaint was so important to the Mayor that the complaint eventually filed with the MDCR was not submitted until the Mayor's wife reviewed it and amended it.

46.    Neither Bazzy nor his wife Nadia wanted the proposed MDCR complaint emailed to them, they instructed Bazzy to 'drop it off for revisions.' It was revised and submitted at the Mayor's instruction.

47.    Unbeknownst to Bazzy at the time, the Mayor was not sincere he was using Bazzy to help justify the personal reasons why the Mayor wanted Chief Meyers terminated. The Mayor led Bazzy to believe it was because he believed Meyers was racist, it was only later that Bazzy would discover that the Mayor used him and his MDCR complaint to get rid of Meyer because he was a political opponent of the Mayor.

48.     In short, the Mayor wanted to terminate Chief Meyers for political

reasons but didn't want it to appear that the decision was solely his, he

wanted to use the MDCR complaint and have his 'hands off' of such a

decision. In other words, the Mayor wanted plausible deniability.

49.     After the Mayor made the final decision that it was time to terminate

Chief Meyer, he asked Bazzy to standby as Meyers would be 'walked

out' in other words escorted out of the DHPD where his gun and

badge would be surrendered on the spot.

50.     In fact several days prior to Meyer's termination, the Mayor instructed

Bazzy to meet him at a local restaurant to discuss how he wanted

Bazzy and Officer Mazloum to 'stand by' as he implemented the

termination plan of Chief Meyers. Unbeknown to Bazzy at the time,

the Mayor wanted to know who said or did anything during the walk

out of Meyers so that he could know what if any members of the

DHPD were with or against the Mayor's decision.

51.     In following the Mayor's instructions, Bazzy and others stood by as

Meyer's was 'walked out' after being told of his termination.

52.     While Meyer's was being walked out, DHPD Captain Corey Smith

threated Bazzy and even reached for his gun. He threatened Bazzy by

telling him he 'would get what he has coming' after placing his hand on his DHPD issued hand gun.

53. Captain Smith accused Bazzy of being aware of the 'walk out' and not disclosing the same to his fellow officers. This event was a point of no return for how Bazzy would be viewed by nearly every non Arab/Muslim police at the DHPD.

54. Bazzy complained about the threat made by Captain Smith but this fell on def ears. The new Chief of Police (Hart) refused to address the threat made to Bazzy on account of not wanting to ruffle the feathers in starting his tenure as Chief of Police for the CDHP. In short, a felonious assault against Bazzy was glossed over without even a reprimand to Captain Smith.

55. Prior to the 'walk out' of Chief Meyers, the Mayor was initially friendly with Plaintiff Bazzy and other Arab Americans, however he almost immediately turned in his attitude towards Bazzy and other Arab/Muslim police officers after Meyer was terminated.

56. In fact, the Mayor and Chief Hart dismissed the aforementioned felonious assault on Bazzi during the Meyers 'walk out' after Bazzy would follow up on the incident. This despite Hart and the Mayor

initially indicating that the incident would be dealt with

'appropriately.'

57.     This reporting by Bazzy of the felonious assault which was never

taken seriously caused Bazzy more isolation within the DHPD, he was

effectively viewed as a 'snitch.'

58.     Hearing that the DHPD was divided and not functioning as a team, the

Mayor called for a meeting with a handful of police officers and other

members of the community and stated openly he cannot promote or

have 'visible' in any capacity Arab Americans within DHPD as that

would not be politically expedient for the 'white vote' within the City

of Dearborn Heights.

59.     The Mayor even stated on more than one occasion that regardless of

merit, his goal was to 'not scare the white voters' by promoting Arab

or Muslims within the CDH and more specifically the DHPD.

60.     Upon information and belief, the Mayor through his then new Police

Chief Hart tacitly encourage or was deliberately indifferent as

harassment of Bazzy escalated. More recently, the Mayor is explicit in

his disdain for Bazzy and support of Hart and how Hart is running the

DHPD.

61.    When Bazzy complained to the Mayor about Hart and DHP management, he was told that he (Plaintiff Bazzy) was the problem and not anyone else.

62.    Hart and his management continued to carry out a policy of targeting Bazzy as it aligned with their agenda as many in the DHPD were very upset that Bazzy assisted in the 'walk out' of Chief Meyers. They had an attitude that Bazzy simply couldn't be trusted.

63.    Under Chief Hart's leadership, and as several Arab American police officers will attest, the DHPD became more divided among racial and ethnic lines.

64.    With the divide within the DHPD growing, five DHPD officers, Plaintiff Bazzy, and members of Dearborn Heights City Council decided to meet with the Mayor to address these concerns as the work climate at the police department had become untenable compromising the quality of policing in the City of Dearborn Heights.

65.    In fact Bazzy and other officers lost confidence that if called for an active crime, they lacked confidence that their fellow officers would have their back.

66.   At the meeting, Bazzy and others voiced that Chief Hart was worse than Gavin or Meyer when it came to issues of diversity, inclusion and even allowed openly racist behavior. They advised the Mayor that Hart set a tone whereby Hart's management targeted and viewed with suspicion fellow Arab American police officers within the CDH.

67.   Rather than take these complaints seriously, in his response, the Mayor insinuated he would absolutely not appoint, support or promote anyone whose ethnicity wasn't white for fear of losing white voters in Dearborn Heights as the dysfunctional work environment within the DHPD had to this point become widely known, including by member of City Council. Mayor Bazzi made it clear to the group that he hired Hart for 'a reason' and that Plaintiff Bazzy and others in the room needed to 'get over it.'

68.   At the same meeting, the Mayor chastised and cursed the only Arab American women police officer in the DHPD causing her to burst into tears. He did so because she agreed with Bazzy and others that the DHPD couldn't function with such obvious racial tension and segregation.

69. With one notably exception, the Mayor, through Chief Hart implemented an unwritten policy of not supporting, and even distancing himself from any police officers who aren't white.

70. The Mayor's unwritten directive was implemented by Chief Hart, Hart's management including Director Kevin Swope went as far as to recruit and hire like-minded friends and former colleagues from the Westland Police Department; this despite their spotty past and poor work ethic.

71. Undeterred, Bazzy refused to be silenced and refused to disassociate with members of his community.

72. Under Hart, the false investigations intensified targeting Bazzy. He was questioned about random ordinary work tasks that others were never questioned about.

73. Under Hart with the full support of the Mayor, Bazzy was even targeted with a smear campaign and fictitious investigations meant to force him out of the DHPD.

74. In just one example of many, Hart and his management with no evidence, circumstantial or otherwise, falsely accused Bazzy of having a sexual relationship with another fellow DHPD officer whereby Bazzy was also falsely accused of assaulting her.

75.   Upon information and belief, the Mayor instructed leadership at the DHP to 'track Bazzy' when it was perceived Bazzy was friendly with members of City Council who opposed the Mayor's policies.  It was clear that because of his perceived political affiliations, the CDH were looking for any pretext to terminate Plaintiff.

76.   In another instance, Bazzy was targeted by a DHPD officer who accessed a TLO report on Bazzy; TLO is an invasive digital background check used by law enforcement as an investigative tool to track criminal activity.

77.   It is widely known that the use of TLO should not be accessed without permission or a lawfully valid reason, as soon as Bazzy found out about this violation he filed a complaint.

78.   The unauthorized access using TLO against anyone without lawful justification is a criminal offense. Bazzy reported this criminal offense.

79.   The DHP officer who accessed TLO in the aforementioned paragraph was an officer that Bazzy had formally filed a harassment claim against, that claim was never investigated.

80.   Bazzy's complaint regarding the unauthorized use of TLO fell on deaf ears and caused further isolation, retaliation and further emboldened other senior members of the DHPD to continue harassing Bazzy and only confirmed to them he was a 'snitch.'

81.   Shortly after the above incident another fictitious and pretextual investigation was launched into Bazzy, this time he was formally investigated for excessive use of force.

82.   Bazzy was investigated for excessive use of force for an alleged incident he didn't take part in, in other words he wasn't even a witness to what transpired nor was he on the scene when the altercation took place.

83.   More recently, a whispering campaign has emerged by DHP management whereby they have let it be known that they are investigating Bazzy for 'ticket fixing.'

84.   Bazzy has never 'fixed tickets,' furthermore, any breaks or professional courtesies provided to any resident who received a traffic ticket was such a common practice among DHPD and beyond that even the Mayor called members of the DHPD to exercise discretion where he thought it may be warranted.

85.    Stated differently, the DHPD didn't have a set policy on reducing traffic tickets and allowed over decades a practice of discretion by its officers.

86.    Rather than implement a clear policy, it appears that the CDH is using 'ticket fixing' as a pretext to target and smear Bazzy for the exact same policies carried out related to tickets by the overwhelming majority of police officers at the CDH.

87.    During the course of his employment at the CDH, Bazzy has emailed, called and text his superiors at the DHPD regarding continued discrimination and harassment, and when pleas for help and intervention went unresponded he asked for the Mayor to intervene, all of his efforts were fruitless and in some instances made him a bigger target for more of the same harassing conduct.

88.    For example, an investigation of Bazzy that was without merit ensued because Bazzy voiced concerns when asked about the harassment endured by fellow Muslim police officer Mahdi Bazzy.

89.    Coincidentally, Mahdi Bazzy filed his own federal cause of action against the CDH for discrimination and harassment and upon information was in fact successful.

90.   If and when Bazzy's complaints were looked into, they were brushed off, he was told by management of the DHPD that such conduct aimed at him either 'wasn't that bad' or not motivated by Bazzy's religion, ethnicity or perceived political affiliation.

91.   To the best of Bazzy's knowledge, no harassing police officers have ever been reprimanded for any of the misconduct towards him.

92.   Bazzy has been forced to endure a work environment whereby officers freely and openly make statements that are racially insensitive towards persons of Middle Eastern and even African American origin.

## COMPENSATORY AND PUNITIVE DAMAGES AND ATTORNEY FEES PURSUANT TO 42 U.S.C 1981

93.   Plaintiff Bazzy repeats, realleges and fully incorporates by reference each and every prior paragraph in this Complaint as though such allegations were fully set forth herein.

94.   Plaintiff had a right under Section 1983 to be free from discrimination based on his race in the 'making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges,

terms, and conditions of the contractual relationship," including the relationship he has as an employee of the CDH.

95. Defendant CDH and its employees and agents acted out of racial and/or religious animus in denying Bazzy's federally protected rights and intentionally treated him in a base, criminal, and subhuman manner during his employment. The discriminatory and humiliating treatment of Plaintiff is utterly unacceptable in a civilized society and were an affront to the values that society expects in the equal treatment of all persons, especially those who are sworn to protect and serve as peace officers.

96. Defendant CDH is liable to Plaintiff for compensatory damages under 1983 for their intentional acts and omissions that caused Plaintiff to sustain and endure sever emotional distress, mental anguish, disgust, revulsion, embarrassment, disparagement, shock, and utter humiliation, in an amount of at least $75,000 or as determined by the trier of fact.

97. The Defendant and its employees and agents acted with malice and/or reckless indifference toward Plaintiff's federally protected rights, singling him out for discriminatory treatment based on his racial and religious classification (an Arab/Muslim), humiliating him, and to

date continue a campaign of harassment and pretextual investigations thus denying Plaintiff his rights. Accordingly, the Defendant, its employees and agents are also liable for punitive damages 1983 because their conduct was based on malice and/or reckless indifference to Plaintiff's legal rights in an amount of at least $75,000 or as determined by the trier of fact.

98.   In addition, the Defendant's conduct as described herein has caused Plaintiff to incur attorney fees and costs and will continue to cause Plaintiff to incur attorney's fees and costs until this action is resolved, and Plaintiff is entitled to recover those attorney fees and costs in accordance with applicable federal laws.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99.   Plaintiff repeats, realleges and fully incorporates by reference each and every prior paragraph in this Complaint as though such allegations were fully set forth herein.

100.  The aforementioned acts and omission by the CDC Executive and upper management at the DHPD were outrageous and utterly intolerable in civilized society, were malicious and/or were conducted

with reckless indifference to the likelihood that emotional distress would result and were intentional toward Plaintiff and intended to cause him emotional distress. They therefore constitute the tort of intentional infliction of emotional distress.

101. The Defendant and its employees and agents acted with malice and/or reckless indifference toward Plaintiff's federally protected rights, singling him out for discriminatory treatment based on his racial and religious classification, humiliating him, and to date continue to 'investigate' Plaintiff without merit for the purpose of denying Plaintiff his rights.

## VIOLATION OF WHISTLEBLOWER PROTECTION ACT, MCL 15.361 et seq.

102. Plaintiff Bazzy repeats, realleges and fully incorporates by reference each and every prior paragraph in this Complaint as though such allegations were fully set forth herein.

103. At all relevant and material times, Bazzy was an employee of Defendant CDH and therefore covered within the meaning of the Whistleblowers Protection Act (hereinafter "ACT"), MCL 15.361 et seq.

104. CDH violated the ACT when they discriminated against Bazzy by way of conduct as described herein.

105. Plaintiff reported this conducted including what he believed to be violations or suspected violations of laws, regulations or policies applicable to police officers as set forth by the State of Michigan, as well as state and federal regulations.

106. The actions of the CDH in retaliation and harassment continue, they were and remain intentional.

107. As a direct and proximate result of CDH and the DHPD's unlawful actions against Bazzy as described herein, Plaintiff has suffered injuries and damages, including but not limited to; loss of career opportunities, mental and emotional distress, loss of reputation and esteem in the community, loss of the ordinary pleasures of daily life including the opportunity to serve as a police officer his occupation of choice.

## VIOLATION OF FIRST AMENDMENT OF FREE SPEECH OF PUBLIC EMPLOYEES

108. Plaintiff Bazzy repeats, realleges and fully incorporates by reference each and every prior paragraph in this Complaint as though such allegations were fully set forth herein.

109. The First Amendment to the United States Constitution is incorporated and made applicable to the State of Michigan by the Fourteenth Amendment to the United States Constitution.

110. Because Chief Hart and other members of the DHPD and the Mayor believe Plaintiff Bazzy is friendly or aligned with some members of the Dearborn Heights City Council that are political on opposite sides of a political divide, by reasons of their actions and set forth herein, and as enforced under the color of state law, CDH and the Mayor have deprived Bazzy of his right to freedom of speech and association in violation of the First Amendment.

111. The Mayor and Chief Hart continue to be in political conflict with the City Council and view Bazzy as somehow aligned with their opponents at City Council.

112. The Defendants actions as set forth herein have and continue to harm Plaintiff Bazzy in a way likely to chill a person of ordinary firmness from further participation in his free speech and association activities.

113. As a direct and proximate cause of Defendant's violation of the First Amendment and other wrongful acts and omissions as set forth in this Complaint, Bazzy has suffered and continues to suffer irreparable harm, including being stripped of his right to speech and assembly, as

well as emotional injury, economic and non-economic injury, thus entitling Bazzy to declaratory and injunctive relief as well as other damages.

## DECLATORY & INJUNCTIVE RELIEF

114. Plaintiff Bazzy repeats, realleges and fully incorporates by reference each and every prior paragraph in this Complaint as though such allegations were fully set forth herein.

115. The DHPD at the direction and instruction of the Mayor has targeted Bazzy in a host of meritless allegations, most recently, one investigation whereby the Mayor publicly declared to 'root out corruption and institutional inefficiency.'

116. The sum and substance of this so-called investigation apparently centers on accusations that Bazzy somehow 'fixed tickets.'

117. Upon information and belief, the Mayor and the CDH actually welcomed a federal lawsuit against the CDH filed by Chief Hart and others in Case No. 2:24-cv-10240. In that case, Chief Hart argues he was wrongfully terminated, harassed and is a whistleblower.

118. Curiously, the aforementioned lawsuit was filed on January 29, 2024 and two days later, a ***stipulation*** for equitable relief was agreed to by

the CDH to permit Chief Hart back to his job. In the same stipulation, it was agreed by the CDH that Chief Hart was likely to succeed on the merits of his underlying claims. Stated differently, Chief Hart filed a federal lawsuit against the CDH and within two days the CDH effectively agreed with everything in his lawsuit without any litigation whatsoever.

119. The aforementioned stipulation to Hart's federal lawsuit was entered into by the CDH in order for Chief Hart to be reinstated as the Chief of Police so as to continue his targeted campaign and 'investigations' into Bazzy.

120. Upon information and belief, Bazzy is in jeopardy of being terminated forthwith now that Hart has been reinstated by stipulation of the CDH.

121. Bazzy has multiple members past and present of the DHPD who will attest to firsthand accounts of the allegations as set forth herein against CDH.

122. If Bazzy is wrongfully terminated it will have devasting effects on his career that cannot be rectified with monetary damages.

123. Declaratory and Injunctive Relief are authorized by 28 U.S.C. Section 2201 and 2202, 29 U.S.C. Section 217, Rules 57 and 65 of the Federal Rules of Civil Procedure, as well as MCL 15.363(1).

124.  For the aforementioned reasons and those set forth in this complaint, the CDH, DHPD and the Mayor should be enjoined from further 'investigations' into Bazzy or any decisions to terminate his employment that have been made or will be made during the pendency of these proceedings, otherwise Bazzy will suffer immediate and irreparable injury, loss and/or damages that cannot be rectified monetarily.

125.  In the event the CDH doesn't also stipulated to injunctive relief as they did for Chief Hart, action by the Court is needed immediately. It would be notable should the CDH not stipulate equitable relief for Bazzy but did so with swiftness when it came to Chief Hart.

126.  Bazzy asks this Court to declare that he not be investigated whatsoever by Chief Hart, director Swope, or director Vanderplow, no employment action to be taken, and no further harassment of Bazzy until the pendency of this case.

## **RELIEF REQUESTED**

WHEREFORE, Bazzy requests this Honorable Court to enter Judgement against the CDH and its principles agents as follows:

A.)    Declare that the CDH acting in concert with the Mayor has violated Bazzy's First Amendment rights of speech and association as set forth herein.

B.) Declare the practices and actions of the CDH as unlawful;

C.) Permanently enjoin the CDH from 'investigating' Bazzy from within its department, any such investigation must be made by an independent party as appointed or approved by the Court;

D.)    Permanently enjoin the CDH from unlawful discrimination and retaliation;

E.) Award Bazzy compensatory, exemplary and punitive damages as determined by the trier of fact,

F.) Award Bazzy his reasonable attorney fees, costs and interest;

G.)    And any such other relief as this Court deems just and proper.


Respectfully Submitted,


/s/ Mohammed Abdrabboh
**MAF Law, P.C.**
Mohammed Abdrabboh (P61989)
Attorney for Plaintiff
1360 Porter St. Suite 200
Dearborn, MI  48124
313-582-5800

Dated: February 13, 2024